UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

                                                    Case No. 8:19-01274-CPM

NATIONAL RADIOLOGY CONSULTANTS, P.A.,

                                                    Chapter 11

                        Debtor.

_____/

### DEBTOR'S EMERGENCY MOTION TO (I) SELL DEBTOR'S ACCOUNTS RECEIVABLES FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS AND (II) TRANSFER CUSTODY OF PATIENT RECORDS

**[Consideration Requested at the December 19, 2019 3:30 p.m. Hearing]**

National Radiology Consultants, P.A. (the "Debtor"), by and through the undersigned counsel, and pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006, and 9014, seeks entry of an order **(i)** approving the sale of its accounts receivables (which are substantially all of the Debtor's assets) free and clear of all liens, claims, and interests; and, **(ii)** transferring custody of patient records to Dr. James Okoh ("Okoh").  In support of this Motion, the Debtor states as follows:

#### BACKGROUND AND JURISDICTION

**1.**     On February 15, 2019, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

**2.**     On July 12, 2019, the Debtor filed its *Amended Disclosure Statement in Connection with Amended Plan of Liquidation of National Radiology Consultants, P.A.* (Doc. No. 121) (the "Disclosure Statement").

**3.**     On August 22, 2019, the Debtor filed its *Second Amended Plan of Liquidation of National Radiology Consultants, P.A.* (Doc. No. 161) (the "Plan").

4.     On September 27, 2019, the Debtor filed *Debtor's Notice of Filing Plan Amendments* (Doc. No. 188) ("Plan Amendments").

5.     On November 12, 2019, the Debtor's Plan as modified by the Plan Amendments was confirmed.

6.     On December 6, 2019, the Court entered an *Order Finally Approving Disclosure Statement and Confirming Second Amended Plan of Liquidation as Modified on the Record of National Radiology Consultants, P.A.* (Doc. No. 203) (the "Confirmation Order").

7.     The Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District pursuant to 28 U.S.C. § 1408.

RELIEF REQUESTED AND BASIS FOR REQUEST

**A.     The Assets to be Sold.**

8.     The Debtor's Plan is a liquidating plan and Section 5.4.2 of the Plan provides that the Disbursing Agent, among other things, shall "administer, liquidate and monetize the Assets" of the Debtor.[1]  The Confirmation Order appointed John Patrick as Disbursing Agent.

9.     One such asset is the accounts receivable ("A/R") which was estimated at $5,476,320.07 in the last *Debtor's Standard Monthly Operating Report (Business) for the Period From 09/01/2019 to 09/30/2019* (Doc. No. 202).

10.     The Disbursing Agent has been in negotiations with several entities to purchase the A/R including Premium Asset Recovery Corporation ("PARC")[2].

---

[1] In addition, the Disclosure Statement included a line item in its financial projections for "[s]elling the accounts receivable represents the proceeds from sale of old or uncollectible accounts receivables for a one time lump sum payment, or, anticipated collections on a contingency basis."

[2] The APA provides that PARC may assign the deal to RCS Recovery Services, LLC, a Florida limited liability company.

11.     JP Morgan Chase Bank, N.A. ("Chase") has a lien on the A/R in the amount of $1,294,725.36 but has agreed to the Chase Carve Out, as defined by the Plan.

**B.     The Proposed Sale**.

12.     The Disbursing Agent proposes to sell the A/R free and clear of all liens, claims, and interests pursuant to Sections 105 and 363 of the Bankruptcy Code.

13.     To effectuate the sale the Debtor and PARC have entered into an *Account Purchase and Sale Agreement* (the "APA") subject to Court approval.  Okoh would become the new records custodian for compliance purposes.   The terms and conditions of the APA are incorporated by reference into this Motion.  A copy of the APA is attached hereto as **Exhibit A.**

14.     The Disbursing Agent believes that the sale is the best possible scenario because the Disbursing Agent has aggressively marketed the A/R and believes that the APA encompasses the best available price and terms for the transaction.

**C.     The Sale Terms Were Negotiated in Good Faith.**

15.     Although the Bankruptcy Code does not define "good faith purchaser", courts, in construing section 363(m), have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'". *In re Abbott's Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Vanguard Oil & Serv. Co.*, 88 B.R. 576, 580 (E.D.N.Y. 1988).

16.     The APA is the product of good faith, arm's-length negotiations between the Disbursing Agent and PARC; and, the sale of the A/R is on commercially reasonable terms.  The Disbursing Agent requests a finding that the transactions contemplated by the APA are **(a)** subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code and **(b)** not subject to avoidance under section 363(n) of the Bankruptcy Code.

<u>MEMORANDUM OF LAW</u>

**A.     The Sale Was Negotiated in Good Faith.**

17.     The Bankruptcy Code provides that a trustee may sell property of the estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. *See* 11 U.S.C. § 363(b)(1). In addition, the Disclosure Statement, Plan, Plan Modifications and Confirmation Order require that the Disbursing Agent liquidate the Debtor's property.

18.     Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, but courts typically consider four factors in determining whether a proposed sale should be authorized: **(a)** whether a sound business justification exists for the sale, **(b)** whether adequate and reasonable notice of the sale was given to interested parties, **(c)** whether the sale will produce a fair and reasonable price for the property, and **(d)** whether the parties have acted in good faith. *See, e.g., In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

19.     Here, each of these four factors has been satisfied. First, sound business reasons exist for the Disbursing Agent to sell the assets.  A rapid but orderly sale of the A/R will maximize the recovery to the creditors by minimizing administrative costs (including the cost of a broker).  Second, the Disbursing Agent will be providing adequate and reasonable notice to interested parties of the opportunity to object to the sale.  Third, the proposed price is fair. Fourth, the Disbursing Agent is proceeding in good faith and will make a showing at the sale hearing that PARC has acted in good faith and that the A/R was fairly and adequately marketed for sale.  Accordingly, the sale procedures should be approved.

**B.    The Assets Should be Sold Free and Clear of All Liens, Claims, and Interests.**

20.    To facilitate the sale of the A/R, the Debtor requests that the Court authorize the sale free and clear of liens, claims, encumbrances and other interests.[3]

21.    Pursuant to Section 363(f) of the Bankruptcy Code, a trustee may sell property under Bankruptcy Code Section 363(b) free and clear of liens, claims, and encumbrances if one of the following conditions is satisfied: **(a)** applicable nonbankruptcy law permits the sale of the property free and clear of such interest; **(b)** the entity holding the lien, claim or encumbrance consents to the sale; **(c)** the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; **(d)** the interest is in bona fide dispute; or **(e)** the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f). *See In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers ... to acquire assets [from a debtor] without any accompanying liabilities"); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

22.    In this case, Section 363(f)(5) is satisfied because **(a)** any entity holding a lien on the A/R could be compelled to accept a monetary satisfaction of its liens and **(b)** the Disbursing Agent proposes that any lien on the A/R sold shall attach to the net proceeds of the sale of the A/R, subject to any claims and defenses the Debtor may possess with respect thereto including the carveout.  As such, the proposed sale satisfies Section 363(f)(5) of the Bankruptcy Code.

---

[3] The *Order Finally Approving Disclosure Statement and Confirming Second Amended Plan of Liquidation as Modified on the Record of National Radiology Consultants, P.A.* (Doc. No. 203) ¶ 1 H states "[t]he Disbursing Agent shall be vested with the power under 11 U.S.C. § 363 to sell any outstanding accounts receivables subject to only review and approval by Chase."  Notwithstanding, the Debtor believes it appropriate to file this Motion.

23.     In addition, Section 363(f)(2) is satisfied because Chase consents to the sale and, given the priority of Chase's liens and the value of the A/R, Chase is the only secured creditor.

24.     Finally, the A/R should be sold free and clear of all successor liability claims, to enable PARC to take clear title. Notwithstanding reference to the conveyance free and clear of "any interest" in Section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

### ADDITIONAL CONSIDERATIONS

**A.     The Court Should Waive or Reduce the Periods Required by Fed. R. Bankr. P. 6004(h) and 6006(d).**

25.     Pursuant to Rule 6004(h) (formerly Rule 6004(g)) of the Bankruptcy Rules), all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless the court orders otherwise. Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).

26.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, a leading treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 14-day period. 10 Collier on Bankruptcy § 6004.10 (15th ed. 2007).

27.     In light of the Debtor's severe liquidity restraints and to limit the costs of administering the Debtor's estate, it is critical that the Disbursing Agent close the sale of the A/R as soon as possible, to maximize recovery to the unsecured creditors.[4]

28.     Accordingly, the Disbursing Agent hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

**B.      Notice.**

29.     Notice of this Motion will be given to **(a)** the Office of the United States Trustee, **(b)** all other parties known to be asserting a lien in the Debtor's assets, **(c)** the 20 largest unsecured creditors of the Debtor, and **(d)** various federal and state tax authorities, including the Internal Revenue Service.

30.     Based on the exigent circumstances described above, the Disbursing Agent respectfully submits that such notice is sufficient and request that this Court find that no further notice of the relief requested herein is required.

31.     In light of the nature of the relief requested herein, the Disbursing Agent submits that no other or further notice is required.

---

[4] For instance, the Debtor's lease expires December 31, 2019.  Therefore, should the Debtor have to pay for critical vendor services beyond that to collect A/R and/or physically store A/R records will present an undue burden.

## TRANSFER OF CUSTODY

32.    The *Employment Agreements* signed by the physicians and the Debtor each state at Paragraph 10:[5]

> 10.    PATIENTS AND RECORDS.  All files and records of all patients belong to Employer and, upon the expiration of this Agreement or any termination for any reason of Physician's employment, Physician will return to Employer all files and records of any patient then in Physician's possession or under Physician's control.  Employer will maintain the files and records in accordance with Physician's Licensure Act, including without limitation provisions that pertain to confidentiality.  The obligations in this Section 10 shall survive the termination or expiration of this Agreement.

33.    In turn, the health professions and occupations act states that absent an express agreement for the employer to be the records owner it is the health care practitioner himself.  Fla. Stat. § 456.057(1).

34.    Upon termination of the practice there is a process to notify patients and the appropriate board office.  *Id.* at 456.057(12)-(13); Fla. Admin. Code 64B8-10.002.

35.    Here, the employment contracts between the Debtor and the doctors states that the Debtor will maintain custody of the patient records subject to the Florida Statutes.  In turn, those statutes state that upon dissolution of the company and by extension termination of those employment contracts that it is incumbent upon Okoh to be the records owner.

## CONCLUSION

For all of the foregoing reasons, the Debtor respectfully requests the Court **(i)** grant the relief requested in this Motion in all respects, **(ii)** approve the APA and the sale, **(iii)** transfer custody of the patient records to Okoh, and, **(iv)** grant such other and further relief as the Court deems just and proper.

---

[5] A sample *Employment Agreement* can be seen in its entirety attached to Proof of Claim 16 filed by Satish Venkataperumal, M.D.

Dated: December 19, 2019.

/s/ Daniel E. Etlinger
David S. Jennis
Florida Bar No. 775940
Daniel E. Etlinger
Florida Bar No. 77420
**Jennis Law Firm**
606 E. Madison Street
Tampa, FL 33602
Telephone: (813) 229-2800
Email: djennis@jennislaw.com
       detlinger@jennislaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was furnished this 19th day of December, 2019, by electronic notification on all registered CM/ECF users and by electronic mail to Dr. James Okoh c/o Kristina Feher.

/s/ Daniel E. Etlinger
Daniel E. Etlinger

THIS ACCOUNT PURCHASE AND SALE AGREEMENT is entered into as of December 18, 2019 by and between National Radiology Consultants, P.A., a Florida profit corporation (the "Seller"), and Premium Asset Recovery Corporation, a Delaware corporation (the "Purchaser").

WHEREAS, in the ordinary course of business Seller has created certain accounts receivable through the provision of medical services; and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Accounts (as hereinafter defined) on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties, covenants and agreements hereinafter set forth, and for other consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## Article I

## CERTAIN DEFINITIONS

As used in this Agreement, the following terms will, unless the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms of the terms defined):

"Account Obligor" means any Person liable on any Account, including, without limitation, any guarantor of or co-payor on the Account.

"Accounts" (i) the accounts receivable listed in the Schedule of Accounts, including the known or unknown obligations of any Account Obligor to pay the receivable and any other amount, interest and fee due or to become due and owing with respect to such accounts receivable, (ii) all rights of Seller to collect and receive all proceeds or streams of income from the foregoing (including rights to payments or proceeds from Third Party Payors, to the extent such rights exist), whether now or hereafter due and owing including, without limitation, any collateral, security interests, assignments, liens and guaranties granted to or made for the benefit of Seller to secure or otherwise assure payment of the foregoing, (iii) the obligation of any Account Obligor to pay the receivable and interest, fees, costs, charges and other assessments, whether accruing before, on or after the Bid File Date with respect thereto, (iv) all Account Documentation, and (v) all proceeds of any of the foregoing, including without limitation, all collections or other amounts received by Seller or any Affiliate or agent of Seller.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person. For the purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities, by

contract or otherwise; and the terms "common control" and "controlled" have meanings correlative to the foregoing, including, without limitation, common corporate ownership.

"Agreement" means this Account Purchase and Sale Agreement.

"Bid File" means the file provided by Seller to Purchaser describing the Accounts as of the Bid File Date.

"Bid File Date" means December 18, 2019.

"Collect," "Collected," "Collection" or any other derivative thereof means obtaining payment of an Account, which includes, without limitation, from or as a result of any permitted sale, factoring, assignment, pledge or other liquidation event of an Account.

"CPT" means Common Procedural Terminology, five-digit numeric or alphanumeric codes that represent medical procedures.

"Current Balance" means the outstanding balance of an Account as of the Closing Date,

"EOB" means Explanation of Benefits, a document showing how the insurer paid a claim.

"HCFA" means billing forms prepared for Health Care Financing Administration, renamed the Centers for Medicare & Medicaid Services (CMS) on June 14, 2001.

"HCPCS" means Healthcare Common Procedure Coding System, which is a condensed set of CPT codes.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as it may be amended from time to time, together with all implementing regulations.

"HITECH" means the Health Information Technology for Economic and Clinical Health Act, a part of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5) as it may be amended from time to time, together with all implementing regulations.

"ICD-9" means International Classification of Diseases, a classification used to code and classify mortality data.

"Legal Requirements" means any applicable federal, state, local, or municipal law, ordinance, principle of common law, code, regulation, or statute.

"Pending Litigation" means a petition, complaint or other pleading has been filed, commenced, or brought by any Account Obligor or his or her representative against Seller or its third-party servicer or collection agent, or both, including, without limitation, any assertion that the claim or receivable giving rise to the Account is invalid.

"Person" means any individual, corporation, estate, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization, government or any agency or political subdivision thereof or any other legal entity.

{00334411.DOCX;4}

"PHI" means any protected health information, as that term is defined in HIPAA.

"Purchase Price" means $50,000.00.

"Revised Schedule of Accounts" means any revised Schedule of Accounts provided to Purchaser pursuant Sections 2.2(a) and 4.2(d).

"Schedule of Accounts" means the Schedule of Accounts attached as **Schedule I**.

"Signature Date" means December 18, 2019.

"Third Party Payor" means any governmental entity, insurance company, health maintenance organization, professional provider organization or similar entity that provides payment for medical and related services (including, without limitation, victim reparations, county payors or third party liability).

"UB" means Uniform Billing that commonly refers to form UB-92, which is also known as Form HCFA 1450, as designed by the National Uniform Billing Committee.

"Wire Transfer Instructions" means the information necessary for transferring the Purchase Price to Seller via wire transfer as set forth on **Schedule V**.

## Article II
## CONVEYANCE OF ACCOUNTS

**Section 2.1  Conveyance of Accounts**.

(a)     Transfer of Conveyed Assets.  In consideration of Purchaser's payment of the Purchase Price to Seller, Seller hereby transfers, sets over and otherwise conveys to Purchaser all right, title and interest of Seller in and to (i) the Accounts listed on the Schedule of Accounts and all monies received in respect thereto on or after the Bid File Date, (ii) to the extent applicable, any and all collateral, security interests, liens and guaranties granted to or made for the benefit of Seller to secure or otherwise assure payment of the Accounts, and (iii) the proceeds from any Account Obligor's estate to the extent such proceeds relate to any Account (collectively, the assets listed in clauses (i) through (iii) of this Section 2.1(a) are the "Conveyed Assets"). Notwithstanding anything in this Agreement to the contrary, the Conveyed Assets do not include (A) any data or information that comprises all or a part of a patient's "Designated Record Set" as that phrase is defined under HIPAA, which group of records will be maintained by Seller, or (B) any Account or any other asset listed in clauses (ii) through (iii) of this Section 2.1(a) that is prohibited by law to be sold, assigned or otherwise transferred, including, without limitation, under Medicare or Medicaid reassignment statutes, regulations or interpretations thereof.

(b) The Closing.  The purchase and sale of the Conveyed Assets will take place within 24 hours of bankruptcy court approval (the "Closing Date"). In consideration of the sale of the Conveyed Assets, on the Closing Date Purchaser will pay to Seller an amount equal to

$50,000.00 by wire transfer of immediately available funds in accordance with the Wire Transfer Instructions.

(c)    In the event Seller or its permitted designees, agents, assigns and successors Collects any monies with respect to an Account following the Closing Date, Seller will remit such monies to Purchaser in conformity with Section 4.1(d).

## Article III
## REPRESENTATIONS AND WARRANTIES

**Section 3.1  Representations and Warranties of Purchaser**.  As a material inducement to Seller to enter into and perform its obligations under this Agreement, Purchaser hereby represents and warrants to Seller that the following statements contained in this Section 3.1 are true and correct as of the Signature Date and will be true and correct as of the Closing Date and each Forward Flow Sale date:

(a)    Organization and Good Standing.  Purchaser is duly organized and validly existing and in good standing under the laws of its state of organization, with all requisite power and authority to conduct its business as such business is currently conducted.

(b)    Power and Authority.  Purchaser has the power and authority to make, execute, deliver and perform this Agreement and to carry out its terms, and the execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary action.

(c)    Binding Obligation.  This Agreement, when duly executed and delivered by Purchaser, will constitute the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws now or hereafter in effect relating to or affecting creditors' rights generally and to general principles of equity (whether applied in a proceeding at law or in equity).

(d)    No Violation.  The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof do not materially conflict with, result in any material breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a material contravention of or a material default under, the organizational documents of Purchaser, or any indenture, agreement or other instrument to which Purchaser may be a party or by which Purchaser or any of its property is bound.

(e)    No Proceedings.  There are no material proceedings or investigations pending or, to Purchaser's knowledge, threatened against Purchaser before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over Purchaser or its properties (i) asserting the invalidity of this Agreement, (ii) seeking to prevent

{00334411.DOCX;4}

the consummation of any of the transactions contemplated by this Agreement, or (iii) seeking any determination or ruling that might materially adversely affect the performance by Purchaser of its obligations under, or the validity or enforceability of, this Agreement.

(f)   <u>No Consents</u>.  Purchaser is not required to obtain the consent, license, approval, registration, authorization or declaration of, or with, any Person in connection with the execution, delivery, or performance of this Agreement that has not been obtained prior to the Closing.

(g)   <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained in this <u>Section 3.1</u>, notwithstanding anything to the contrary in this Agreement, Purchaser makes no other representation or warranty, either express or implied, whatsoever.

**Section 3.2   Representations and Warranties of Seller Regarding General Matters**.  As a material inducement to Purchaser to enter into and perform its obligations under this Agreement, Seller hereby represents and warrants to Purchaser that the following statements contained in this <u>Section 3.2</u> are true and correct as of the Signature Date and will be true and correct as of the Closing Date and each Forward Flow Sale date:

(a)   <u>Organization and Good Standing</u>. Seller is duly organized and validly existing and in good standing under the laws of its state of organization, with all requisite power and authority to conduct its business as such business is currently conducted.

(b)   <u>Power and Authority</u>.  Seller has the power and authority to make, execute, deliver and perform this Agreement and to carry out its terms; and the execution, delivery and performance of this Agreement by Seller has been duly authorized by all necessary action subject to bankruptcy court approval

(c)   <u>Binding Obligation</u>.  This Agreement, when duly executed and delivered by Seller, will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws now or hereafter in effect relating to or affecting creditors' rights generally and to general principles of equity (whether applied in a proceeding at law or in equity).

(d)   <u>No Violation</u>.  The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof do not materially conflict with, result in any material breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a material contravention of or a material default under, the organizational documents of Seller, or any indenture, agreement or other instrument to which Seller may be a party or by which Seller or any of its property is bound.

{00334411.DOCX;4}

(e)     <u>No Proceedings</u>.  There are no material proceedings or investigations pending or, to Seller's knowledge, threatened against Seller before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over Seller or its properties (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (iii) seeking any determination or ruling that might materially adversely affect the performance by Seller of its obligations under, or the validity or enforceability of, this Agreement.

(f)     <u>No Consents</u>.  Seller is not required to obtain the consent, license, approval, registration, authorization or declaration of, or with, any Person in connection with the execution, delivery, performance, validity, or enforceability of this Agreement that has not been obtained prior to the Closing.

(g)     <u>Solvency</u>.  Seller has filed bankruptcy and confirmed a chapter 11 plan.

(h)     <u>Creditors</u>.  Seller is not selling the Conveyed Assets to Purchaser with any intent to hinder, delay or defraud any of its creditors.

(i)     <u>No Brokers or Finders</u>.  Seller has not employed, engaged or agreed to pay any investment banker, broker or finder who might be entitled to a fee or commission in connection with the transactions contemplated by this Agreement.

(j)     <u>Title</u>.  (i) Seller has good and marketable title to each Account free and clear of all claims, liens, pledges and other encumbrances, and (ii) immediately upon transfer pursuant to this Agreement, Purchaser will acquire good and marketable title to each Account, free and clear of all claims, liens, pledges and other encumbrances.  No Account has been sold, transferred, assigned or pledged by Seller other than to Purchaser pursuant to this Agreement.

**Section 3.3 Representations and Warranties of Seller Regarding the Characteristics of the Accounts**.  As a material inducement to Purchaser to enter into and perform its obligations under this Agreement, Seller hereby represents and warrants to Purchaser that the following statements contained in this <u>Section 3.3</u> are true and correct as of the Signature Date and will be true and correct as of the Closing Date and each Forward Flow Sale date:

(a)     <u>Characteristics of Accounts</u>.  Each Account (i) was originated in the ordinary course of its business, (ii) is a valid, binding and enforceable obligation to pay the full amount shown on the Schedule of Accounts, (iii) is not classified as a charity or indigent Account, and no Account Obligor qualifies for charity or indigent status, and (iv) is not otherwise subject to laws prohibiting transfer of the Account.  The information regarding each Account in the Account Documentation is accurate and complete.

{00334411.DOCX;4}

6

(b)     <u>Compliance with Law</u>.  The creation of each Account complied at the time it was originated or made, and on the Closing Date complies, in all material respects with all Legal Requirements.  All PHI related to each Account has been handled by Seller in compliance with all requirements of HIPAA, and there are no investigations pending, threatened or currently undertaken by any federal or state authority, and no other claims, inquiries, regulatory proceedings or complaints have been made or are pending or threatened with respect to any violation of HIPAA relating to any Account.

(c)     <u>Schedule of Accounts</u>.  The balances of the Accounts set forth on the Schedule of Accounts accurately reflect the Current Balance of such Accounts as of the Closing Date and includes all receivables contained in the Bid File.

(d)     <u>No Impairment.</u>  Except for the transfer, set-over and conveyance contemplated under this Agreement, Seller has not done anything to convey any right to any Person that would result in such Person having a right to payments due under an Account.

(e)     <u>No Proceedings</u>.  There are no proceedings pending, nor to Seller's knowledge, threatened, wherein an Account Obligor or any governmental agency has alleged that an Account is illegal or unenforceable, or has asserted that fines, penalties, adjustments, refunds or damages may be payable with respect to an Account.

(f)     <u>Services or Products Provided</u>.  The services, products or other consideration underlying the Accounts have been provided and delivered and there is no requirement for any future services, products or consideration.

(g)     <u>No Third-Party Contracts</u>.  There are no contracts or agreements with third parties for the servicing or Collection of any Accounts, except with respect to Accounts that have been recalled from such third-party servicer or collection agent and as to which there are no outstanding fees, charges or other claims.

(h)     <u>Servicing</u>.  Each Account has been serviced in conformity with all Legal Requirements and in conformity with Seller's policies and procedures that are consistent with customary, prudent industry standards.

(i)      <u>No Adverse Selection</u>.  The Accounts were not selected by any adverse or intentional selection or scoring methodologies, whether by or on behalf of Seller.

(j)     <u>Cell Phones</u>.  Each cell phone number provided by Seller to Purchaser with respect to an Account was provided directly to Seller by the Account Obligor and Seller has obtained each Account Obligor's consent to deliver communications to the Account Obligor at the cell phone number provided to Purchaser for purposes of providing account information and/or debt collection using any one or more of the following: an automated telephone dialing system or device; an automatic e-mailing system; artificial or prerecorded

voice calls or messages; and/or any other electronic message (voice or text based) delivered by an automatic electronic messaging system.

(k)    <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained in <u>Section 3.2</u> and in this <u>Section 3.3</u>, notwithstanding anything to the contrary in this Agreement, Seller makes no other representation or warranty, either express or implied, whatsoever.

**<u>Article IV</u>**

**<u>COVENANTS</u>**

**Section 4.1  Covenants of Seller**.  Seller covenants and agrees as follows:

(a)    <u>Other Liens or Interests</u>.  Except for the transfer, set-over and conveyance contemplated under this Agreement, Seller will not attempt to transfer, set over, convey, sell, pledge or assign to any Person, or grant, create, incur, assume or suffer to exist any lien on, or any interest in, to or under, the Conveyed Assets.

(b)    <u>Account Documents</u>.

(i)    <u>Electronic Access</u>. Subject to <u>Section 4.1(b)(ii)</u>, Seller will, with respect to each Account, provide Purchaser remote access (with view-mode access only) to Seller's patient management, patient accounting and document imaging systems (collectively, the "<u>Account Files</u>") free-of-charge; provided, however, that the cost of any software licenses and hardware necessary for Purchaser to gain such access at the facilities of Purchaser will be borne solely by Purchaser.  Seller will identify in the Account Files that the Accounts have been sold to Purchaser. Seller agrees that it will not purge any Account from its systems for a period of five (5) years from the applicable purchase date.  Subject to <u>Section 4.1(b)(ii)</u>, for each Account, the Account Files will include all patient and guarantor demographic data, all billing and financial data, and all other information necessary to substantiate said Account obligations (collectively, the "<u>Account Documentation</u>").

(ii)    <u>Physical Records</u>.  To the extent any of the Account Documentation is not available electronically pursuant <u>Section 4.1(b)(i)</u> above, Purchaser may request such information in writing (a "<u>Record Request</u>") from Seller pursuant to the procedures set forth in this <u>Section 4.1(b)(ii)</u>.  Each Record Request must be submitted by Purchaser in writing to Seller.  Seller or its permitted designees, agents, assigns and successors will use commercially reasonable efforts to obtain and deliver to Purchaser the requested Account Documentation set forth in each Record Request within ten (10) days after Seller's receipt of the Record Request, or earlier to the extent a shorter period of time is required by applicable law (collectively, the "<u>Response Period</u>").  Purchaser agrees to promptly reimburse Seller for any third party costs and expenses (properly supported by third party invoices) that Seller or its

{00334411.DOCX;4}

8

permitted designees, agents, assigns and successors incur in obtaining and delivering the requested Account Documentation pursuant to this <u>Section 4.1(b)(ii)</u>.

(iii)    <u>Certifications</u>.    In the event Account Documentation is requested pursuant to <u>Section 4.1(b)(ii)</u> above, and such Account Documentation does not exist, Seller will deliver to Purchaser, within the Response Period, free-of-charge, a certification confirming such information does not exist.

(c)    <u>Class Action Lawsuits and Other Legal Proceedings</u>.    Seller will give written notice to Purchaser within five (5) days of (i) the filing of any class action lawsuit or other legal proceeding against Seller that could have a material adverse effect on any of the Accounts, or (ii) any change in an existing class action lawsuit or other legal proceeding against Seller that could have a material adverse effect on any of the Accounts, including without limitation, any settlement of such class action lawsuits or other legal proceedings.

(d)    <u>Direct Payments</u>.

(i)    From and after the Closing Date and continuing thereafter in perpetuity, Seller shall pay over and deliver to Purchaser all monies or other consideration (regardless of the form of its receipt, e.g., walk-in, lock-box, check, electronic remittance) directly or indirectly received in connection with any Account (regardless of the individual or entity making or conveying such payments or consideration and regardless of whether the aggregate amount of such payments or consideration with respect to any Account exceeds the Current Balance of such Account as of the Closing Date with respect to such Account) on or after the Bid File Date ("<u>Direct Payments</u>").

(ii)    All Direct Payments are the property of Purchaser and until delivered to Purchaser shall be held by Seller in trust for Purchaser and shall not be commingled with Seller's funds or assets.

(iii)    Seller shall not receive any compensation for its receipt or delivery to Purchaser of Direct Payments.

(iv)    Seller shall not refuse to accept money or other forms of payment made or offered in connection with any Account provided such money or payment is made on an unconditional basis.

(v)    If any Account Obligor owes (or formerly owed) multiple debts to Seller (including debts evidenced by Accounts acquired under this Agreement) and a single payment is made to Seller by the Account Obligor for less than the total amount of all such debts, the payment shall be applied as instructed by the Account Obligor, or in the absence of such instruction, to the oldest account originated by Seller, whether such account is held by Seller or is included in the Schedule of Accounts.

(vi)     Each calendar week following the Closing Date, Seller shall remit to Purchaser all Direct Payments received by Seller since the date of its last remittance of Direct Payments to Purchaser, together with an electronic report identifying, at a minimum with respect to any Direct Payment (A) the name of the patient and Account Obligor, (B) the original Account number, (C) the date the Direct Payment was received, (D) the amount of the Direct Payment, and (E) the identity of the payor or payment source (e.g., private pay or Third Party Payor). Any amount payable by Seller under this Agreement and not paid within ten (10) days from the due date will be delinquent and will bear interest at the lesser of one and one-half percent (1½%) per month or the maximum monthly rate allowed by applicable law.  This Section 4.1 (d) (vi) may not be modified by course of performance between Purchaser and Seller.

(vii)     If at any time in the future an insurance provider or other third party requests a reimbursement or refund of monies which were remitted to Seller prior to the Bid File Date, Seller shall be solely responsible for processing such reimbursement or refund.  Seller agrees to indemnify Buyer against, and hold Buyer harmless for, any claims or liabilities relating to such a reimbursement or refund.

(e)     <u>Business Records and Post-Closing Communications with Account Obligors</u>.  On the Closing Date, Seller will update its records to reflect that the Accounts have been sold to Purchaser pursuant to this Agreement.  Seller will refer all inbound communications from Account Obligors and their applicable representatives and agents received on or after the Closing Date to Purchaser at such telephone numbers and/or addresses as Purchaser may provide to Seller for such purpose from time to time in a timely and commercially reasonable fashion.

(f)     <u>Credit Bureau Reporting</u>.  If Seller has reported information regarding any Account sold herein to any credit reporting agency, it shall within thirty (30) days of the Closing Date, report to each and every credit reporting agency to which it has previously reported such information that the Account has been sold to Purchaser.

(g)     <u>Purchaser's Right to Audit</u>.

(i)     Subject to the minimum necessary requirements imposed by HIPAA and any other Legal Requirements, Purchaser and its designees have the absolute right, during Seller's normal business hours, with prior written notice to Seller, to review, copy and audit all documents and records in Seller's possession relating to (A) the Accounts, (B) Direct Payments, (C) Seller's compliance with this Agreement, (D) confirmation of amounts shown as Current Balances, and (E) any other information as is necessary to permit Purchaser to conduct an accurate and complete audit or review of the Accounts, Direct Payments and to

confirm amounts shown as Current Balances including, without limitation, any information necessary to verify, reconcile, or account for all funds paid or received in connection with the Accounts, including Direct Payments.    In addition, Seller will use commercially reasonable efforts to periodically provide to Purchaser such reports relating to those items subject to audit pursuant to this <u>Section 4.1(b)(g)</u> as Purchaser may request.

(ii)    Seller will cooperate with Purchaser in all aspects of any audit and review conducted by Purchaser in accordance with <u>Section 4.1(g)(i)</u>, and in such connection Seller will provide, without charge, such reasonable access to its facilities, records, files, equipment and such other amenities as may be necessary to permit Purchaser to conduct an accurate and complete audit and review.

(iii)    Purchaser's audit, or its failure to audit, or the right to audit, does not relieve Seller of its responsibility or obligation to comply with this Agreement, nor does Purchaser's failure to detect or the detection of, but the failure to notify Seller or require Seller's remediation of, any noncompliance constitute acceptance of such nonconformity or a waiver of Purchaser's rights.

(h)    <u>Assistance</u>.  Seller will use its commercially reasonable efforts to timely process any requests or inquiries relating to (i) an Account's enforceability, (ii) any act or omission of Seller, its employees or its agents, (iii) an individual's exercise of any right granted to the individual under HIPAA and HITECH (to the extent compliance with such provision of HITECH is then required by the Office of Civil Rights of the United States Department of Health and Human Services) and any other state-law equivalents relating to the Accounts, or (iv) if necessary, execution of pleadings, affidavits or any other documentation (or produce appropriate officers and employees as witnesses) necessary to commence, file or otherwise proceed with the filing and prosecution of liens or collection lawsuits or to submit a claim in any bankruptcy proceedings to which an Account may be subject.

**Section 4.2  Covenants of Purchaser**. Purchaser covenants and agrees as follows:

(a)    <u>Collection Procedures</u>. Purchaser agrees to abide by all of the terms, conditions and obligations set forth on **Schedule II**.

(b)    <u>HIPAA and HITECH Compliance</u>.   By virtue of the terms of this Agreement, Purchaser will become a "Business Associate" of Seller as defined in HIPAA and will come into possession of PHI.  Purchaser agrees to maintain the security and confidentiality of PHI as required by Legal Requirements, including HIPAA and the regulations promulgated thereunder.  Seller and Purchaser have entered into a Business Associate Agreement for purposes of HIPAA and HITECH compliance.  Dr. James Okoh shall be considered the records custodian for HIPAA and other regulatory compliance.

{00334411.DOCX;4}

(c) <u>Government Access to Records</u>.  At Seller's request, Purchaser agrees to promptly make available its policies, books and records related to the use and disclosure of PHI to the Secretary of the U.S. Department of Health and Human Services, or his or her designee, for the purpose of determining whether Purchaser and Seller are in compliance with HIPAA requirements.

**Section 4.3   Mutual Covenants**.  Seller and Purchaser each covenant and agree as follows:

(a)     <u>Confidentiality</u>.  The existence of this Agreement, the terms hereof, and any information disclosed to a party hereto under the terms of this Agreement will remain confidential and will not be disclosed by the receiving party(s) without the written consent of the disclosing party(s), except to the extent such disclosure is required to be made under any Legal Requirement, or as may be required to effect the purposes of this Agreement.

(b)     <u>Acting as a Witness</u>.  If any legal or equitable action is filed by or on behalf of any party(s) hereto to Collect on an Account which requests or subpoenas an officer or employee of another party(s) hereto to appear at a trial, hearing or deposition to testify, said filing party(s) will reimburse the other party(s) for their officer's or employee's reasonable out-of-pocket expenses incurred in connection therewith.

(c)     <u>Cooperation</u>.  Purchaser and Seller each agree to reasonably cooperate with the each other as may be required for a party to this Agreement to comply with any healthcare, debt collection and credit reporting Legal Requirements.

**Article V**

**CLOSING**

**Section 5.1   Seller's Obligations**.

(a)     <u>Documents to be Delivered at Closing</u>.   At Closing, Seller will deliver to Purchaser:

    (i)     an executed copy of the Bill of Sale, substantially in the form attached as **Schedule III** (the "Bill of Sale"); and

    (ii)    any and all other documents that are needed by Purchaser to effect the sale and transfer of the Accounts and which are within the custody and control of Seller.

**Section 5.2   Purchaser's Obligations**.  At Closing, Purchaser will pay to Seller an amount equal to the Purchase Price

**Article VI**

**INDEMNIFICATION**

**Section 6.1   Indemnification of Seller**.

{00334411.DOCX;4}

(a)    <u>Third Party Claims</u>.  Purchaser agrees to indemnify, defend and hold Seller, and its parents, Affiliates, subsidiaries, predecessors, officers, directors, employees, agents, and permitted successors and assigns (collectively, the "<u>Seller Indemnitees</u>"), harmless from and against all losses, judgments, damages, expenses, interest or other costs (including reasonable attorney fees and consequential, punitive or other special damages) (collectively, "<u>Losses</u>") in connection with any action, claim, suit or proceeding (collectively, "<u>Claims</u>") by third parties to which any of Seller Indemnitees are subjected that arise out of, or are attributable to, (i) the failure of any representation or warranty made by Purchaser in this Agreement to be true and correct as of the Signature Date or as of the Closing Date, (ii) any breach by Purchaser or its permitted designees, agents, assigns and successors (collectively, the "<u>Purchaser Members</u>") of any of Purchaser's covenants or agreements contained in this Agreement, including, without limitation, those covenants and agreements set forth on **Schedule II**, or (iii) any assignment, enforcement, Collection, servicing or administration of an Account by a Purchaser Member after the Closing Date.

(b)    <u>First Party Claims</u>.  Purchaser agrees to indemnify, defend and hold Seller Indemnitees harmless from and against all Losses (provided that no Seller Indemnitees will be entitled to consequential, punitive or other special damages in connection with a first party claim) that arise out of, or are attributable to, (i) the failure of any representation or warranty made by Purchaser in this Agreement to be true and correct as of the Signature Date or as of the Closing Date, or (ii) any breach by a Purchaser Member of any of Purchaser's covenants or agreements contained in this Agreement, including without limitation, those covenants and agreements set forth on **Schedule II**.

(c)    <u>Assumption of Defense</u>.  Notwithstanding the provisions set forth in this <u>Section 6.1</u> to the contrary, at its option, Purchaser will have the right to assume the defense, in a manner and with counsel reasonably acceptable to Seller, of any Claims for which Seller Indemnitees are entitled to indemnification under this <u>Section 6.1</u> and to directly pay for all Losses that may be imposed in connection therewith.

**Section 6.3  Notice**.  Promptly after discovery, the indemnified party will notify the indemnifying party of any Claim or threatened Claim.  Failure to give such notice to an indemnifying party will not affect any indemnification hereunder except to the extent that such failure adversely affects the indemnifying party's ability to defend such Claim or increase the indemnifiable Loss relating to such Claim.

**Section 6.4  Procedures**.  If the indemnifying party elects to assume the defense of any Claim as permitted by <u>Sections 6.1</u> and <u>6.2</u>, as the case may be, the indemnifying party will select defense counsel that is reasonably acceptable to the indemnified parties and will

bear all expenses in connection with the defense and settlement of any Claim.  In such event, the indemnified parties will have the right, at their own expense, to participate in the defense of any Claim against which they are indemnified and that has been assumed by the indemnifying party.  In the defense of any Claim, the indemnifying party must not, except with the written consent of the indemnified parties (such consent not to be unreasonably withheld, conditioned or delayed), consent to entry of any judgment or enter into any settlement that either: (a) does not include, as an unconditional term, the grant by the claimant to the indemnified parties of a full release of all liabilities in respect of Claims; or (b) otherwise adversely affects the rights of the indemnified parties.  The indemnified parties will cooperate with the indemnifying parties in every reasonable way to facilitate the defense and settlement of any Claim.

**Section 6.5  Survival of Covenants, Agreements, Representations and Warranties**.  Each covenant, agreement, representation and warranty made in this Agreement will survive the Closing Date in perpetuity.

## Article VII

## [Intentionally Deleted]

## Article VIII
## MISCELLANEOUS PROVISIONS

**Section 8.1  Binding Effect/Entire Agreement/Amendment**.  This Agreement will be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns.  This Agreement, including the schedules hereto, constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior written and oral proposals, understandings, agreements and representations, all of which are merged and incorporated herein.  No representations, warranties and/or covenants have been made by either party to the other except as expressly set forth herein.  Any schedules to this Agreement are incorporated by reference into and made a part of this Agreement for all purposes.  This Agreement may not be amended, supplemented or modified without the prior written consent of Purchaser and Seller.

**Section 8.2  Severability**.  The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, each of which will remain in full force and effect, so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner materially adverse to any party.

**Section 8.3   Waivers**.  No party will be deemed to have waived any of its rights or remedies under this Agreement unless such waiver is in writing and signed by such party and then only to the extent specifically recited.  No failure to exercise and no delay or omission in exercising any right, remedy or recourse on the part of any party will operate or be deemed as a waiver of such right, remedy or recourse hereunder or preclude any other or further exercise thereof.  A waiver or release on any one occasion will not be construed as continuing, as a bar to, or as a waiver or release of any subsequent right, remedy or recourse on any subsequent occasion.   All rights and remedies of each party, whether pursuant to this Agreement, or any other document or instrument delivered in connection therewith, are cumulative and concurrent and may be exercised singly, successively or concurrently at the sole discretion of such party and may be exercised as often as occasion therefor may exist.

**Section 8.4   Notices**.    All demands, notices and communications under this Agreement must be in writing, personally delivered, sent via overnight delivery service, or mailed by certified mail, return receipt requested, and will be deemed to have been duly given upon receipt to:

    (a)     Purchaser:

             Premium Asset Recovery Corporation

             550 Fairway Drive, Suite 101

             Deerfield Beach, FL 33441

    (b)     Seller:

             John Patrick

             401 E. Fern Street

             Tampa, Florida 33604

or, as to each of the foregoing, at such other address as is designated by written notice to the other party.

**Section 8.5   No Third-Party Beneficiaries**.   Each provision of this Agreement confers rights and remedies upon only, and is for the sole and exclusive benefit of, Seller and Purchaser.  No other Person has any rights or remedies, or is a direct or indirect beneficiary of, or will have any direct or indirect cause of action or claim in connection with, this Agreement, and none of the provisions of this Agreement will be deemed to be for the benefit of (or enforceable by) any other Person; provided, however, that Article VI will inure to the benefit of any indemnified parties pursuant to Article VI.

**Section 8.6   Assignment**.  Neither Purchaser nor Seller may assign or transfer any of their respective rights and obligations pursuant to this Agreement (by operation of law or otherwise) to any other Person without the other parties' representative's written consent;

provided, however, that (a) Purchaser may assign its rights and obligations pursuant to this Agreement to (i) an Affiliate, (ii) one or more of the third parties set forth on **Schedule IV,** and (iii) upon Seller's prior written consent, which consent may not be unreasonably withheld or delayed, any other third party, (b) Purchaser or its assignees may pledge, as security, its rights in the Conveyed Assets and its rights under this Agreement to any entity (and its successors, assigns or Affiliates) which may be providing funding or financing to Purchaser or its assignee, (c) Purchaser or its assignee may resell or reassign any Conveyed Asset to (i) an Affiliate, (ii) one or more of the third parties set forth on **Schedule IV**, and (iii) upon Seller's prior written consent, which consent may not be unreasonably withheld or delayed, any other third party, and (d) Purchaser or its assignee may resell or reassign any Conveyed Asset if any Account Obligor thereon is deceased or subject to a bankruptcy proceeding. Nothing in this Agreement will prevent Purchaser from engaging one or more third parties to provide Collection and any related services in connection with the ownership or Collection of the Accounts.

     **Section 8.7  Headings and Cross-References**.  The various headings in this Agreement are included for convenience only and will not affect the meaning or interpretation of any provision of this Agreement.  References in this Agreement to articles, sections or schedules are to such Articles, Sections and Schedules of this Agreement.

     **Section 8.8  Governing Law**.  THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER OR THEREUNDER WILL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

     **Section 8.9   Counterparts**.  This Agreement may be executed in counterparts, each of which will be deemed an original, including facsimile transmissions thereof, but all of which together will constitute one and the same instrument.

     **Section 8.10 Expenses**.  Except as otherwise expressly provided in this Agreement, Seller and Purchaser will each bear their own respective out-of-pocket expenses, including fees and disbursements of its attorneys and any other agents or representatives in connection with the transactions contemplated by this Agreement.

     **Section 8.11 Relationship**.  Nothing in this Agreement is intended to or will be construed to constitute or establish an agency, joint venture, partnership or fiduciary relationship between the parties, and no party will have the right or authority to act for or on behalf of the other with respect to any matter.

**Section 8.12 Drafting**.   Neither this Agreement nor any provision contained in this Agreement may be interpreted in favor of or against any party hereto because such party or its legal counsel drafted this Agreement or such provision.

**Section 8.13 Attorneys' Fees.**   Should Seller or Purchaser retain counsel for the purpose of enforcing or preventing breach of any provision of this Agreement, including, but not limited to, instituting any action or proceeding to enforce any provision of this Agreement, for damages by reason of any alleged breach of any provision of this Agreement, for damages by reason of any alleged breach of any provision of this Agreement, for a declaration of such party's rights or obligations under this Agreement or for any other judicial remedy, then, if the matter is settled by judicial determination or arbitration, the prevailing party (whether at trial, on appeal, or arbitration) shall be entitled, in addition to such other relief as may be granted, to be reimbursed by the losing party for all reasonable costs and expenses incurred, including, but not limited to, reasonable attorneys' fees and costs for services rendered to the prevailing party.

IN WITNESS WHEREOF, the parties hereto have caused this Account Purchase and Sale Agreement to be executed by their respective duly authorized officers as of the date and year first above written.

**SELLER**

NATIONAL RADIOLOGY CONSULTANTS, PA

By: _____

Name: JOHN PATRICK

Title: CRO /DISBURSING AGENT

**PURCHASER**

PREMIUM ASSET RECOVERY CORPORATION

By: _____

Name: CHRIS CONWAY

Title: CEO

## Schedule I

## SCHEDULE OF ACCOUNTS

The Purchase Portfolio containing the following:  all remaining accounts receivables and bad debt.

is identified by Purchaser in the Acknowledgement of Purchased Accounts contained in the Excel Workbook and sent via encrypted electronic mail or FTP to Seller on or before the Closing Date, and which may be reproduced by Purchaser or Purchaser's Assignee as necessary to confirm purchase.

## Schedule II
## COLLECTION PROCEDURES AND OTHER ITEMS

1.      Purchaser acknowledges that by purchasing the Conveyed Assets pursuant to this Agreement, PURCHASER IS HEREBY AGREEING TO HONOR AND ABIDE BY ALL OF THE TERMS, CONDITIONS, COMMITMENTS AND AGREEMENTS SET FORTH BELOW:

- Purchaser agrees to treat each Account Obligor fairly and with respect.

- Purchaser agrees to honor and abide by any payment schedule Seller has agreed to with an Account Obligor with respect to an Account prior to the Closing Date.  Any such payment schedules will be set forth in the Accounts Documentation.

2.      After the Closing Date, Seller may provide one or more of the Account Obligors written or oral notice that his, her or its Account has been transferred to Purchaser at the Account Obligor's last known address.

3.      Without limiting any other provision in this Agreement or this **Schedule II**, Purchaser hereby agrees to comply with all Legal Requirements applicable to healthcare, debt collection and credit reporting, including without limitation, HIPAA, the U.S. Bankruptcy Code, the federal Debt Collection Practices Act, the federal Consumer Credit Protection Act, and the federal Fair Credit Reporting Act.

4.      Purchaser agrees to only pursue Collection lawsuits in connection with Accounts where (A) the scoring attributes (as developed by Purchaser or its Affiliates) or circumstances associated with an Account Obligor indicate an ability to pay, or (B) the resources or assets of an Account Obligor demonstrate a likelihood of payment.

5.      Purchaser will (a) promptly forward to Seller, and Seller will be responsible for handling in a timely manner pursuant to its policy and procedures and all Legal Requirements, any and all requests (a "Request") received by Purchaser from a patient concerning the patient's rights under HIPAA or similar state or local law, and (b) use commercially reasonable efforts to assist Seller in promptly complying with any Request.

6.      Purchaser may engage one or more of the third parties to provide Collection and any related services in connection with the ownership or Collection of the Accounts. Purchaser agrees to notify Seller of any such engagement.

{00334411.DOCX;4}

## **Schedule III**

## **BILL OF SALE**

[Remainder of Page Intentionally Left Blank]

## CERTIFICATION OF ACCOUNT PURCHASE AND SALE AGREEMENT AND BILL OF SALE

**I. Name and Date.**  The following Account Purchase and Sale Agreement (the "Purchase Agreement") is the subject of this Certification of Account Purchase and Sale Agreement and Bill of Sale:

"The Purchase Agreement, dated the _____ day of _____, 20___"

The Purchase Agreement currently exists and is in full force and effect.

**II. Seller, Purchaser & Assignee.**  Seller (referred to herein as the "Seller") and Purchaser (referred to herein as the "Purchaser") of the Purchase Agreement are:

Seller: National Radiology Consultants, P.A.

Purchaser: Premium Asset Recovery Corporation

The Purchase Agreement is assigned to and managed by (referred to herein as the "Assignee"): Premium Asset Recovery Corporation.

**III. Powers of Assignee.** The Assignee of the Purchase Agreement is authorized to liquidate, settle, compromise, adjust, bring and defend legal proceedings, and do and perform all other acts as may be necessary or appropriate in connection with any of the foregoing.  All powers of the Assignee, as Assignee of Purchaser, are fully set forth in the Purchase Agreement.

**IV. Bill of Sale**.  This Bill of Sale is made and delivered pursuant to, and subject to the terms of, the Purchase Agreement, of even date herewith, by and among Seller and Purchaser. Capitalized terms not otherwise defined in this Bill of Sale will have the meanings given to such terms in the Purchase Agreement.

    1.    Seller hereby absolutely transfers, sets over and otherwise conveys to Purchaser, all right, title, and interest in and to the Conveyed Assets, as described in the Purchase Agreement and as set forth on Schedule I of the Purchase Agreement.

    2.    This Bill of Sale will be effective as of the Closing Date.

    3.    Seller hereto agrees to execute any and all documents and to perform such other acts as may be necessary to further the purposes of this Bill of Sale and the transactions contemplated by the Purchase Agreement and this Bill of Sale.

**V. Manner In Which Title Should Be Taken.**  The full legal name of the Assignee for purposes of obtaining judgments, holding title of judgments, liquidating, settling, compromising, adjusting, bringing and defending legal proceedings, and performing all other acts as may be necessary or appropriate in connection with any of the foregoing is: "Premium Asset Recovery Corporation"

**VI. Attestation.**  The signatories of this Certification of Account Purchase and Sale Agreement and Bill of Sale attest to the validity, completeness, and confidentiality of the Purchase Agreement and declare that the foregoing statements are true and correct.

**VII. Validity of Copies.** A copy of this Certification of Purchase & Sale Agreement and Bill of Sale shall be just as valid as the original.

        IN WITNESS WHEREOF, Seller has caused this Certification of Purchase & Sale Agreement and Bill of Sale to be executed by its respective duly authorized officer as of the date and year first above written.

**SELLER**

_____

By: _____

Name: _____
Title: _____

## **Schedule IV**

## **PERMITTED ASSIGNEES/TRANSFEREES**

RCS Recovery Services, LLC, a Florida limited liability company

## **Schedule V**

## **WIRE TRANSFER INSTRUCTIONS**

Bank Name: _____

Bank Branch Address: _____

ABA Number: _____

Account Name: _____

Account Holder's Address: _____

Account Number: _____